Good morning. Thank you. You may begin. Good morning, Your Honor, and may it please the Court. Richard Peterson from Pepperdine Law School Special Education Advocacy Clinic, appearing on behalf of the parents and the child in this case. Also appearing with me is my very able certified law student, Emily Spire, and what we'd like to do is, I would take, I'd like to reserve five minutes for rebuttal. Speak for eight minutes and allow my law student to speak to the issue of mootness for two minutes, if that's okay. Okay, just watch your time. I'll try to help you with it. We'll do it. Thank you. You know, we're requesting that this court safeguard parents' procedural safeguards under the IDA for two reasons. Number one, it assures meaningful participation by the parents in the decision-making process, and number two, it helps avoid unnecessary litigation that is derived from unilateral district decision-making. We're really here because these parents have been sued three times, once before this case, this case, and once after, and it's a little moment to the parents that they have a right to engage in litigation to protect their rights. Congress intended for this IDA process to be collaborative and that parents were to be equal partners in IEP decision-making. When the procedural safeguards are not protected, what Congress intended does not happen. In fact, in Burlington, the Supreme Court said that districts, and pointed out that Congress had found that districts have a natural advantage when it comes to expertise and knowledge and in resources. So I'm curious why, in this particular case, the settlement agreement that the parties reached wouldn't be dispositive of the issues, or most of the issues, with respect to the triennial IEP. Well, it wouldn't be because the settlement agreement came about because of their first lawsuit to force this little girl to Curry Middle School. What was agreed, because what we wanted was for them to go through the IEP process, we argued predetermination then, and that the district was unilaterally making this decision. We wanted there to be an IEP where the IEP team engaged in a discussion to determine placement. Now, this was in May of 2012, so unless we entered into an agreement where we actually said, you know, we're not going to sue you in this intervening time, they would not have been within the time requirements of the IDEA, because we pushed this out to October of 2012. So there is no waivers of any rights with respect to this child's FAPE associated with the development of this IEP, and for them to suggest otherwise would be to suggest that the parent, I mean, if that were the case, the district could just refuse to never finish the the IEP. And then, supposedly, if what the district said was true, you waived everything through the completion of the IEP, as long as they never completed the IEP, there'd never be a basis for the parents to to make a claim. So, you know, that argument was so ridiculous the administrative law judge didn't even talk to it. These kinds of agreements are entered into all the time, and what the district did not want was for us to come in between May of 2012 and October of 2012. Let's assume the settlement issue is not an issue here, and we proceed to the merits, I guess. What did the Tustin School District here need to do that it didn't do that would have adequately involved the parents in the placement decision, in your view? Thank you for that. And it's not a high bar. Number one, when they wanted to prior written notice, and what what the judge, administrative law judge, and what the district law judge took was kind of a layman's view of what that might mean. Prior written notice doesn't mean just giving notice of your intent to move the child. Everybody knew that's what they wanted to do. But prior written notice includes specific elements, including what what are you doing, proposing, why are you proposing it, what other options did you consider, why did you reject those options, what documents did you rely on. The importance of prior written notice is to help avoid, as a union case says, he said she said kind of evidentiary arguments. This would have been very easy for the district to do, but they couldn't do it, because the second point of our argument in terms of what the school district should have done. Well, why isn't, I mean it seems like the ALJ gave a very considered opinion, you know, opinion or decision here. And I understand, though, that your point is well taken regarding the notice. But the ALJ, which I think we have to defer, gives substantial deference. If we conclude that we have to defer, and that the issue before us then is whether there was a preponderance of the evidence that supports the ALJ's decision, doesn't his decision, you know, support that preponderance of the evidence? Because the notice, even though your point is well taken, it seems like it's more deemed like harmless because the parents were already well aware of the placement proposal. Well, that's exactly the problem, your honor. You know, let me just point out the problem with the court, the administrative law judge. First of all, deference, this extensive deference, is in matters that involve educational policy. We believe compliance with the IDA does not require that deference. Let me just address one holding of the administrative law judge and the district court. They said every witness, every district witness and every Orange County Department of Ed witness, testified that Curry Middle School was an appropriate placement. That is not accurate with respect to their opinions as of March 11, 2013. The administrative law judge said that Susan Slonim was perhaps the educator that knew the child best and that he gave great weight to her testimony and that her testimony should not be discounted in any way. Well, on cross-examination, after Susan Slonim said she thought that Curry was appropriate, she was asked, when was the last time that you saw Curry Middle School prior to this IEP on March 11? She said October of 2012. What did you find there? I found that it was not very well structured and it was not appropriate. On cross-examination that it was appropriate. She could not have had, neither could Ms. Fitzpatrick or the other witnesses, because when they saw it prior to March 11, they thought it was inappropriate and that's the understanding that Mr. Hollister had, that it was inappropriate. So Mr. Hollister has to make a decision, am I going to provide informed consent or not? Now the reason the district could not provide appropriate prior written notice is because they knew in the IEP, they did not at any time ask the IEP team members, including those that knew the child best, the Orange County, they never asked them, what is your opinion? Imagine, if I can just say this, Your Honor, imagine what a difference it would have made if during that IEP, if in fact what the district tries to claim is true, that Curry was an appropriate placement. What if the administrator would have looked to the Orange County Department of Ed people and said, tell us your opinion about Curry, is it appropriate? What if those people would have looked the parents and said, it's going to be okay, Mr. and Mrs. Hollister, it's appropriate, it'll meet their needs. They didn't do that. Well, but the ALJ stated that a school district must ensure that the placement decision is made by a group of persons, this is what the ALJ said, is made by a group of persons including the child's parents and concluded the evidence clearly demonstrates that parents were not denied meaningful participation in the IEP process, including as to the issue of placement. So it seems like the ALJ did appear to appreciate the distinction that you're emphasizing, you know, or certainly that you emphasized in your in your briefs between the parental involvement and the development of the IEP goals and parental involvement in the placement decision. Your Honor, the problem with that is that statement by the ALJ is not supported by any of the evidence. I mean, it really is baffling to me because, you know, this case wouldn't be here. Parents, no parents should have to endure what these parents went through. For the judge to say that they were not denied participation when the people that knew the child best said nothing and they didn't say anything, and this is important, because they thought the placement was not appropriate. So how can that possibly... We want to give your student the two minutes that you... Yeah, I think I'm at three minutes right now. Well, that's your total time. Oh, yeah. So if you want to step aside. Good morning, Your Honors. May it please the Court. Emily Speyer, certified law student. Can you speak up? Yes. Can you hear me better? This case is not moot because the injury at issue is capable of repetition, yet it is evading review. The district has already committed numerous procedural violations of the IDEA and has sued appellants three times for asserting their procedural rights. Given this attitude, and the fact that SH will be forced to endure many additional IEPs administered by the district, this injury is not only capable of repetition, it is likely to be repeated. Moreover, cases like this almost always evade review because IEPs generally expire within a year. How old is the... She's 17 years old. Because of this... So what is the exact remedy that you're seeking in this case? We would like this court to reverse the decision of the district court and the ALJ and to enjoin the district from committing future procedural violations or changing or initiating litigation against the parents to change SH's placement without, excuse me, explicit written consent of the parents. Where is SH now? She's still at the OCDE program. Second, this case is not moot because this court can still grant appellants meaningful relief. While the evidence has shown that the district court wants SH at Curry Middle School no matter what, declaratory relief will ensure that SH's and her parents' procedural rights are respected in the future. SH and her parents are entitled to an IEP process that complies with the IDEA. Declaratory relief ensures that their rights will be respected. Thank you very much. All right. Good morning. May it please the court. Karen Van Dyke on behalf of the Tustin Unified School District. The first question I would like to address is the whole prior written notice issue. My contention has always been that the IEP document, which as you may know is very voluminous, does meet the requirements. It goes through every piece of the IEP that you can go through. It lists out the changes that the parents requested. They're in handwriting. So there was a very, very deliberative process that built up to why the district offered this placement. It's based upon assessment, which then from that assessment, goals are derived from which those goals are derived placement and so I would contend that that IEP document suffices in that it does meet the requirements of the IDEA and the prior written notice requirement. In addition, I think the district went one better by bringing the family to the actual site. It is at least the third time they had been to the school. They were given the opportunity to look at the classroom, to ask questions, to again revisit the various items that were of concern to the family regarding safety. What the argument made this morning, to oversimplify, is that there were people in the meeting who didn't think that this was an appropriate placement and that the notice didn't tell the parents that. Okay, well let me speak to that. He does cite to Susan Slonim and that is the only piece that he cites to. Susan Slonim was the current teacher at OCDE at the time. The district brought in Susan Slonim, her current teacher in the fall, to look at the how it could be better. We wanted to do the most we can to serve this child. She did in fact make some recommendations which were changed in accordance with her recommendations before the IEP team. The district knew that. The fact that they didn't go observe it until a few a week or month after that is of no consequence because it was made. And again, this is one of those things where I'd say, you know, the district kind of went farther in this case than what I would normally see any district do. And in terms of whether it was an appropriate or not appropriate, they were recommendations. But at the end of the day, every witness did testify it was an appropriate placement, including their own expert. And so the fact that the observation took place after the IEP team meeting, I don't know that that's meaningful. There were enough people at the meeting that had seen the program that could make the recommendation. And frankly, the district's the one that's obligated to ultimately commit the well aware that that program had been changed and made to meet the needs of the child. Do you think on this predetermination issue, which we really haven't touched on, there's anything in the IEP where there's kind of a compare and contrast? Let's look at the current placement. Let's look at Curry and see which would meet the child's needs best. I didn't see that that really occurred. Well, I think that at the time of the placement discussion, they were talking, well, actually all along the way, they were kind of talking about how, for example, in one of the meetings, it was how would the goals look at in both environments? They knew they were looking at two different environments when the transition plan was initially proposed. That's that's what we're supposed to do. We're supposed to present something we think is appropriate and then have discussions that follow. There were extensive discussions about that transition piece in terms of going from one place to the other. Now, O. C. D. E. Had a lot of input on that and decided to the record to show that that transition plan had many components to it and each and the services as well. And they talked about the transition between the providers. One teacher would collaborate with the other. They talked about all kinds of things. One would have surmised that if that didn't work, they would have said something. And under Adams v. Oregon, the district's held to know what it knows when it knows based on the information it has. Parents did not object to this. In fact, parents agreed to the observation. And, um, the last sentence in the I. E. P. Said the district would like to propose the week of the 18th. The parents will get back to them. We had no idea that there was a non consensus, to be honest with you. So that's that's kind of a big thing on our part where we thought we were working together. And then later on, we find out apparently there was a disconnect. Thank you. The the second issue I just like to touch on is with respect to the settlement agreement. Um, I understand what opposing counsel is saying about the I. P. Process. But I do know that there has been some history with the family and there there was a concern that there would be a number of meetings that were required. The district, as you know, six meetings, I believe around 30 hours, um, knew that that's not gonna happen in one day. That's why that agreement was written that way so we can ensure that we're not gonna blow any timelines, create any procedural issues that that would come up later. So that was the district's understanding of the settlement agreement. Now, there was some statement that the A. L. J. Didn't reference the agreement, and that's true. He didn't. And I don't know if it's because he wanted to just rule on the merits because it was cleaner or if he didn't have jurisdiction because it was a settlement agreement. But the district court did. I believe it's seven did actually address that issue. Um, he said he didn't need to as well. We understand that's here, but because of the merits of the case, we're not gonna reach it. And so there was an acknowledgement of the settlement agreement. It's just they felt strongly on the record that, as always, it's probably a stronger case toe actually rule on the merits as opposed to come out on some other procedural grounds. Okay, and in terms of the briefing, I did notice that there was some issue taken with respect to the timing of the district's filing and all I will say timing of the district's filing process complaint in the process. There was a request for an independent educational evaluation, and under state law, we have the obligation to either fund the independent educational evaluation or file our own due process hearing to defend that evaluation, and it must be done within a reasonable time. I've no hard and fast rule in my own brain. It's between 30 and 45 days. If you look at the cumulative cases that I've reviewed, so the district was on a legal obligation to file on that I E. If nothing else, but the placement as well. We, too, have that obligation to file a due process hearing when we feel we have something in a lesser restrictive environment. In this case, despite the contention by the appellant, there was a discussion over L. R. E. I believe it is on E. R. 971. It talks about the integration available with typical peers at the at the Curry campus, whereas at the campus she was in Meadow Park and now the new one help you. There's no general education students there. There's no access at a comprehensive campus. There is. There's mainstreaming opportunities. Would those happen right away? No, she's you know, there were some concerns, but slowly being integrated, having exposure, you know, lunchtime. I'm not saying she's going to sit with them, but she's gonna have access and slowly but surely the idea requires us to go in that direction. If we felt that we had a program that met this child's needs in the least restrictive environment, we're not legally permitted to place elsewhere. Rather, we have an obligation to explain why we're not that's maybe a disconnect here because I sense from appellants that they feel like the district's bullying them and using the process. And and certainly that's not the case. It's a simple effort to comply with our legal obligations, and we believe we have a program where we believe that S. H. Can fit that program and benefit from that program. When did the parents get legal counsel? Yeah. Um, I can't say for sure when they were retained. I know on the very first case with the settlement agreement, I was involved in that. Mr Peterson was representing the family at that time. There's also, um there's also an assertion that there was no consensus on the IEP at the end. I think throughout the briefing, there's numerous contentions. I just again want to point back to the actual IEP and the testimony where you have a number of people testifying about the program. And at the end, there's no understanding on anybody's part that this isn't the direction we're going. And there's an agreement to visit. There is a visit. There's an email from, um, the student's father that basically says, I need more time to figure it out if I can make this work. It didn't say we wanted something else. It just said he needed more time to make it work. And in fact, we didn't file immediately. We waited an entire month after our our initial deadline that was given. So we weren't acting hastily. So I thought when the father asked for additional time to consider this, that the district refused the extra week. Well, there was a program administrator that did that. But we actually did extended a month. We didn't file until late April. So yes, that email came back and said, No, we're not going to wait. But in fact, we did wait. One more thing I just want to point out. In terms of the transition plan and all of that, there's a lot of, there wasn't enough participation. She needed this very heavy plan in order to get from one place to the other. The district did a really, really, I think, good job of trying to accommodate for that. The one fact I do want to point out that when the district had to face the situation of Meadow Park closing, it had to make a determination as to whether we're gonna bring her back to our program or allow the child to continue at Hillview High School, which is an O. C. D. E. Program. Working with the parents, we agreed to keep her in the O. C. D. E. Program. And I just want to note that there was no transition plan on that transition, and she transitioned fine. And I think that's something notable. Um, just to point out that the district has tried to work with the family to address the concerns, perhaps more than were necessary. And your honors, I don't have anything else unless you have any questions. Thank you. Thank you. Rebuttal. Yeah. Just briefly, Your Honor, in terms of your question about the I. P. Where there was no compare and contrast, that's the exact thing that we claim is necessary. That's what Congress envision. It's also part of the least restrictive environment determination to kind of way what would be best. That didn't happen when they talk about thinking that there was a consensus. I mean, the district is argued that we didn't even know that the parents, uh, weren't weren't in agreement or it's interesting that the administrative law judge, the district court left out completely out of their holding the email that the parents sent on on March 28th, where the parents said, Please, we have questions. We'd like to have them answered. Can we meet and do that? And can you give us one week extension? So for a district that's claiming that they were working with the parents, they flat out said no. Now they didn't grant any extension. It just took him a few weeks to get their paperwork together to sue. No one ever told the parents that they had an extension. And in fact, Miss Parker said, I never she never communicated with the parents further again. What a difference it would have made if the parents request to meet and try to work this out would have been respected. That's exactly what union says about preventing. He said, she said, because the district, the administrative law judge said, Well, the parents had an opportunity to ask questions at their visit on March 27. There's no written record of that. So the parents are vulnerable because it's not in prior written notice. The district's reference to the I. E. Part of the due process complaint is irrelevant except for the fact they did give prior written notice on the I. E. Issue. They didn't with respect to this and they admitted and Miss Parker admitted in her should have done it. Um, the least you want to wrap it up here. Okay. Um, just that email exchange. No comparing contrast. There was no consensus. And I think that if you look at the reason why the parents brought the child to the county was because the district could not meet their needs. They thought she was not educable. The parents brought her to the Orange County. I was there and help them. And now the district less than a year later wanted to unilaterally bring her back. Thank you. Thank you. Um, Miss Spire, it takes a lot of courage to come up and argue as a law student. And you did a lovely job. Thank you very much. Uh, Mr Peterson, Miss Van Dyke, thank you for your very helpful presentations today. Thank you. Uh, the matter of S. H. Versus Tustin Unified School District is submitted.
judges: Schroeder, Murguia, Gleason